In re LEVERTON.  (2.)

(District Court, M. D. Pennsylvania.  September 6, 1907.)

No. 897, in Bankruptcy.

BANKRUPTCY—ALLOWANCES TO TRUSTEE—REMOVAL FOR MISCONDUCT.

A trustee in bankruptcy removed for cause *held*, on his accounting, not entitled to allowance of personal expenses or commissions on the ground that, although residing at a distance of 75 miles from the property, he secured the appointment by soliciting claims to be sent to his attorney, and that he was guilty of willful misconduct in conniving with the bankrupt in concealing the books of the business, and favoring the bankrupt's relatives in the sale of the property.

In Bankruptcy.  On report of John W. Codding, referee, sustaining exceptions to the account of Henry Goodman, trustee.

C. A. Van Wormer, for trustee.

J. C. Ingham, for creditors.

ARCHBALD, District Judge.  The trustee, having been removed by the court for due cause, has filed his account, charging himself with $2,282, received from a sale of the bankrupt's goods, and taking credit for insurance, rent, watchman, expense of making appraisement, etc., amounting to $200.46, which the referee has allowed, and for personal expenses of $40.95, and commissions of $85.64, which he has refused; and the case is thereupon brought here by the trustee to review these rulings.  The items in question are objected to by creditors, on the ground that the accountant has been unfaithful to his trust, having been not only overfriendly with the bankrupt, against whom there are charges of fraudulent concealment which he has failed to prosecute, but having so conducted the sale of the store stock, about the only other duty he had to perform, as to discourage some and favor other bidders, relatives of the bankrupt, by whom it was principally purchased.  Both grounds of complaint are abundantly sustained by the evidence.

It was shown in the proceedings for the removal of the accountant that before the petition in bankruptcy was filed, but when it was plainly immanent, the accountant was furnished by the bankrupt with a list of his creditors, in order that he might go to them and effect a compromise of 50 cents on the dollar, which the bankrupt was prepared to offer, the accountant who was also a creditor being promised the whole of his claim for doing so, and that, when this fell through, the list was made use of to solicit and get claims into the hands of the accountant's attorney, by which the election might be controlled and the accountant chosen.  Profession was indeed made to the other creditors, at the time of his election, of an intent to follow up the bankrupt, the meagerness of whose stock, after the extraordinary purchases made within a few months of his failure, called for rigid scrutiny and vigorous action.  But nothing came of it.  And, on the contrary, there is evidence that the accountant has sided, if not colluded, with the bankrupt since then.  The books and papers, relating to the business of the bankrupt, for instance, are of the utmost importance upon the question of fraud or irregularity, and so far only a very meager part

of them have come out of hiding. The bankrupt says that he left everything of the kind in the store, but the receiver, after searching diligently, was not able to find them. That they were not there is plain. And yet first one, and then another of these books, or what purport to be such, after their existence had been established by other evidence, together with certain bills or invoices, turn up in the hands of the accountant, both he and the bankrupt having previously denied on more than one occasion that there were any. He says he got them in the store, and he endeavors to account for their previous nonproduction by the suggestion that they were in the hands of his attorney. They do not amount to much as they stand, either books or bills; those which would do so not being forthcoming. But such as they are, and whether genuine or fictitious, of which there is some question, the accountant must have got them from the bankrupt, with whom he is thus convicted of conniving and juggling with regard to them. In re Robert Lewin, 18 Am. Bankr. Rep. 72, 155 Fed. 500.

But even more serious than this is what occurred at the sale of the bankrupt's stock by the accountant. When it was about to take place, for instance, he refused to await the arrival of the train which was due in a few minutes, upon which bidders were expected and came, nor would he allow those who had gathered to go into the store and examine the goods until the hour for the sale had come, or within a few minutes of it. The stock, also, instead of being arranged so that the same class of goods, such as boots and shoes, hats and caps, underwear, trunks, clothing, or furnishings, would be together, were divided up into unusual and mixed sections, of which it was very difficult to get at the value. It is true that what purported to be lists were put in the hands of bidders, but no opportunity was given to test them, and, while other bidders had to take the chance of this, M. Kaufman, an uncle of the bankrupt, with whom the accountant was also on very friendly terms, in some unaccountable way seems to have become possessed of these lists in advance, by which (being also plainly favored in other ways by the accountant in his bidding) he was enabled to become the successful purchaser of nearly every section. As a part of the last one, also, consisting of odds and ends, there was included, according to the subsequent contention, but unknown to any one at the time except the accountant and Kaufman, a certificate for $5,000 of gold mining stock, which had been bought according to the bankrupt a few days before his failure for $1,250, in cash, of his cousin Harry Kaufman. This was scheduled by the bankrupt at $750, but was struck off with the rest of the section to M. Kaufman for $12. It is said that it is worthless, and that the purchaser is satisfied to return it; but that is not the question. It is the good faith of the accountant that is in issue, which is not helped out by anything ex post facto. It is also said that the fairness of the sale is shown by the amount realized, which was 80 per cent. of the appraisement, an unusual experience. But, if so, it was by no favor of the trustee, whose conduct was not calculated to conduce to it. And that considerably more could have been secured, if he had been at all anxious for it, is shown by the gains made, when a resale of one or two sections, which had been

struck off to Kaufman, was forced by the other bidders. It is further said that the referee refused to disturb the sale upon the very same exceptions as are now urged against it, and that this concludes the subject. But there is nothing to show upon what the judgment of the referee was then based, and it might have been out of consideration for the different purchasers, which would be another matter.

That the referee, under the circumstances, properly denied the accountant's claim for commissions, there can be no question. It is specifically provided by Bankr. Act July 1, 1898, c. 541, § 48c, 30 Stat. 558 [U. S. Comp. St. 1901, p. 3439], that "the court may in its discretion withhold all compensation from any trustee who has been removed for cause." But, without this, upon the general principles which prevail with regard to the administration of trusts, compensation is to be withheld where there is either fraud or willful misconduct. 28 Am. & Eng. Encycl. Law (2d Ed.) 1038.

Nor do the expenses of the accountant stand any better. Hanna v. Clark, 204 Pa. 145, 53 Atl. 757. These, in the present instance, are made up of railroad fares, hotel bills, etc., made necessary because the bankrupt's estate was at Dushore, while the accountant lived at Scranton, 75 miles distant. Had a trustee been selected from the vicinity, as should have been done, in the interest of economy, this expense would have been entirely obviated. And as the accountant, through the solicitation of claims, not to say interest in the bankrupt, pushed himself forward into the place, now that occasion has been found to remove him, he must bear the brunt of it.

The exceptions to the report of the referee are dismissed, and the report confirmed.